So, we will first hear from counsel in S.L.X. S.A.R.L. v. Bank Of America Corporation. Mr. Bondari, am I pronouncing your name right? Yes. And you have reserved three minutes. Is that correct? That's correct. Okay. You are welcome to start. Okay. Thank you very much, Judge Perez and members of the panel. May it please the Court, Rishi Bondari for S.L.X. S.L.X. was a great company with a very promising future. It was a revolution at the stock market. The big banks, the six defendants in this case, Ed Eckelrand, did not want to revolutionize the stock market, and they argued that essentially S.L.X. filed its claim to it. No one disputes that the underlying allegations about the bank's conduct are true, but Judge Sullivan determined, as a member of law, on a motion to dismiss, that S.L.X. should have filed its claim some time before the summer of 2014, and instead S.L.X. filed its claim in November of 2014. This case is critically important because it involves continuing violation of doctrine and fraudulent concealment doctrines, which have serious implications for all civil cases. And if I may, Counselor, are you asking us in this case to come up with a new per se rule that a continuing violation is always going to result when we're talking about a group boycott? No, Your Honor, we're not asking for that as a new per se rule. We're saying in this case that if there was a continuing violation in this group boycott, then every single time that a new overt act is taken— But is that a new rule, then? No, I believe that's a standard rule from Zenith, as it says from the Zenith case, each time a plaintiff is injured by an act of the defendant, a cause of action accrues to him. Right, but this—and help me out. I am sympathetic. Like, we seem to have a situation in which someone is in the midst of what I might call a hard sell. Someone is trying to close the deal. You have somebody who is not trying to take no for an answer and someone who's kind of being coy about it. But at what point does it become the same activity, and at what point does it become something that ends? And when is something new? Isn't a lot of what is happening in this case an original outgrowth of the boycott attempt or the alleged boycott attempt? So, Your Honor, each overt act that's taken for a group of sex conspiracy starts a statute of limitations from writing. As this court opined in Borger v. Yonhap, which is the Second Circuit 1980 case, causes of action for future damages will accrue on the date they are stuck, and as I've seen in radio, that is a contrary rule, would make the defendant immune from liability at the statute of limitations and run the original act. Right, but what happens in a scenario like this one if nobody had purchased or if a third party had purchased? I mean, it seems to me that what we're trying to do is calibrate it between a bunch of different kinds of scenarios and facts and trying to thread the needle right, and so I'm hoping you can help us in this situation. That's exactly right, Your Honor. So I'm going to start by saying, in this case, there was clearly an overt act, which was the purchase. Now, it's very possible you're going to have another case one day where there's not a purchase, and you have to figure out when was there a final and irrevocable deal. And maybe you'll be able to figure that out on a motion to dismiss. Maybe it's the sort of thing that asks for the trial, but that is not this case, Your Honor. But if you sold two years later, would that mean the statute of limitations would have begun running two years later? It would start running, yes. Yes, it would. It would start running, because the last... If you waited five years, then it would start running five years later. Yes, Your Honor. Take the Yamaha-Borger case, for example. That conspiracy, antitrust conspiracy, started in 1912. That was basically the... Not that one's a good one, but other cases where the conspiracy started in 1912, and it was for renting machinery. Oh, that was Hanover Shoe, excuse me. That's the classic, most seminal case. But in Hanover Shoe, the conspiracy for the leasing of machines started in 1912, but it reset every time there was an overt act. So, Judge Barrett, the important part about our case is there's clearly an overt act, which took place in May of 2015. Now, that... And I can talk about that just in a moment. Judge Sullivan said, no, you can't use the May 2015 date as your overt act, because there's no injury or erosion there. I mean, is that fair? I thought it was more that it was the outgrowth of the original act and it being really hard to find an endpoint, right? Because one of the things that Judge Jacobs and I are troubled by is the fact that what would have happened if you never sold, right? Would it still be going on today? What would have happened if you had sold to a third party? Like, when would you have attached a violation on the part of the defendants? Like, we're trying to figure this out, and I would just encourage you to answer the question that we're trying to grapple with. Okay, so I'm going to answer that question directly, Judge Barrett. First, what's important is you had to find a date when there was a final and irreparable refusal to deal. Now, that final and irreparable refusal to deal happened in a lot of different ways, Your Honor. The classic example is, of course, one day the defendants in a particular case say, you know what, we're not going to do business. You know, they did refusal to deal, refusal to deal, refusal to deal with a parts manufacturer for, let's say, an automobile. A classic example of when there's a final and irreparable refusal to deal, even when there is no purchase of the technology, is when they decide to do another refusal to deal with another parts manufacturer, and they enter an exclusive arrangement with that. So when there is a final and irreparable refusal to deal, that is when the statute of limitations definitely starts to run. But couldn't that be made clear from the circumstances? Does there have to be this moment, oh, I've chosen someone else, or I've bought your technology. Doesn't it become apparent at some point here when they just say, no, it's like the mafia. You're never going to get in. Go away. Give up. At some point, doesn't that become final and irrevocable, even if no magic word is used? As I said earlier, that is very fast, Mr. Judge Barrett. And it's very possible that you could have a final and irrevocable refusal to deal under circumstances that you're describing. And maybe that's suitable for a motion to dismiss in some instances because of the way it's played. Maybe it's not. Here, I think you're talking about the comment about the mafia. And frankly, I'm definitely 100% going to address that, which is explaining why that should not trigger a final and irrevocable refusal to deal, that that should not have been sufficient for that, and also why it's not sufficient for writing the seal. Would it be OK if I came back to that? Of course. Yeah, yeah. Before I just finish addressing what Judge Barrett said here? Great. So the issue here is we do have an overt act. And there's going to be other cases that are harder ones, Your Honor. There's going to be times when you have to do exactly what Judge Murray just suggested, which is figure out when the heck did the final and irrevocable refusal to deal happen. Here, you don't have to figure that out. There was an overt act taken by the defendants where they decided to buy the IP in order to eliminate SLX as a competitor. If you read Judge Sullivan's decision, he says, the injury realized with the 2014 sale lost profits on the sale of their patents and business model was the direct result of the defendants' refusal to deal with plaintiffs in the years prior to the sale. So, Your Honor, just to answer your question, that's the mistake that Judge Sullivan made. He said that the injury was the exact same, or it was a continuation. He said it was an unabated continuation of the refusal to deal previously. Well, I'm sorry. So help me out. One of the things that I think I'm hearing you say is that it's a very fact-specific inquiry to suggest when there was a refusal to deal. And Judge Miriam offered some scenarios. Judge Jacobs offered some scenarios. Are you saying that this is a question that's not appropriate for a judge to decide? It's 100% appropriate for a judge to decide. A judge has to decide. They might not be able to decide on a motion to dismiss. In this case, like I keep saying, in this case there was an overt act. So this is one of the easy cases because there was a contract that was entered into in May of 2015. So, but at what point would they have decided, oh, shoot, you know, there was an overt act and it's passed the statute of limitations? The overt act, the final act in this conspiracy from our position was the purchase agreement that was entered into on May 26, 2015. OK, but clearly Judge Sullivan disagreed, right? No, no. Your Honor, sorry. OK, go ahead. OK, go ahead. No, go ahead. No, go ahead. No, he never even addressed it, Your Honor. There's the U.S. Airways v. Sabre case, which basically says the manifestation of a prior, that there could be a continuation of antitrust activities, but what they are is called the manifestation of a prior overt act of entering into a contract. He never, ever addressed the fact that the 2015, the May 2015 overt act was entering into a contract. This Court has said in the U.S. Airways v. Sabre case, the Conn v. Colbert, Kravis v. Roberts case, that when you enter into a contract, that is the date, and that contract is an overt act in furtherance of the conspiracy, then that is the date in which the statute of limitations starts to run. Now, everybody, for the purpose of motion to dismiss the case, Judge Sullivan did accept that. You read his decision on page 18 of his decision. He says specifically, plaintiffs were injured because they claimed defendant's conduct forced SLX to close its doors and sell off its intellectual property for a fraction of the true value of the property. He states that the purpose of the transaction was to eliminate SLX as a competitor. He accepts that for the purposes of his decision. But then he says, he said, for plaintiffs, the injury realized in the 2015 sale, lost profits on the sale of their patents in the business model, was the direct result of defendants' refusal to deal with plaintiffs. So first, I want to explain that that's totally wrong. He doesn't cite anything. He doesn't cite any cases. He doesn't grapple with the fact that logically that's not a correct analysis. Let's take this case. There were refusals to deals in 2011, 2012, 2013, 2014. Now, this is very important for the fraud and concealment argument that I'm going to get to in a few minutes. But during those refusals to deal, like before by, you know, how many refusals to deal there were, there were tons of expressions of interest. No one ever told. So this is the fraud and concealment argument, so I don't want to go too far into it. But no one ever told SLX, hey, guys, there's an antitrust conspiracy. No one's ever done this. Instead, in 2014, Jamie Dimon, or excuse me, in 2014, J.P. Morgan, had more meetings in late 2014 as we allege in our complaint. J.P. Morgan had more meetings with SLX. They were interested. People were very interested. Jamie Dimon had met with SLX's people and said that. So there are all these refusals to deal that are happening. What are the damages that arise from those refusals to deal? Well, SLX is not getting revenue that it could have gotten. Right. I mean, so I just want to make sure, because you are over time, that we stick to the statute of limitation issue. You do have some time reserved if you want to talk about the fraudulent concealment or the damages issue. Is there anything else that you guys want to hear from with respect to the statute of limitation issue? My colleagues? Okay. Thank you. We'll hear from you on rebuttal. Okay. And thank you, Ms. Rosenberg. Your colleague did get a few more minutes, so we'll keep you as long as we need you. You need not be stressed about that. Thank you, Your Honor. And may it please the Court. Lauren Rosenberg on behalf of the Morgan Stanley defendants. And I also have the pleasure of giving this morning on behalf of all defendants in this case. These are two alleged antitrust conspiracy cases, the first of which was filed in November 2018, alleging that the defendants forced the SLX trading platform out of business. And according to the complaints, the defendants had refused to invest or do business at the latest by the summer of 2014. SLX had begun looking for investors even earlier, in 2013, and had shuttered its doors by September of 2014. It applied to cancel its trading license, and the headline read, SLX to shut up shop. All of that happened more than four years before filing this case. These cases are therefore time-barred under the statute of limitations, barring some exceptions. What do you say to your adversaries' argument that in Hanover Shoe, which is late 60s, the conspiracy was ongoing from 1912? So what does Hanover Shoe say about the continuing violations doctrine? Hanover Shoe was a very different circumstance, because the refusals to deal in that case, which was refusals to sell machinery, resulted in a lease at a super-competitive price, and therefore the injury occurred on an ongoing basis beginning in 1912 all the way through 1955. There was continually accumulated injury at every point of the super-competitive lease. That's very different here from the circumstance— Is that because there were different people applying for a lease? It's not because there's different people applying for a lease. It's because the lease itself had new and accumulating injury. It's not that different from a price-fixing conspiracy in which, in that circumstance, the alleged super-competitive price is above and beyond and creates accumulating injury. Hypothetically, suppose there was another inventor who had another way of making this process more efficient and tried to get your clients interested in it, and they shut it down. There wouldn't be any statute of limitations problem then, would there? If they came forward now and said, why don't you use or buy our system, and your clients said basically no, we're happy the way we are, and we're not going to use your system, because it won't be as profitable for us. You're asking if there was a new— Yes, a new inventor, somebody else. —and certainly the statute of limitations, as to them, would not have run as a different fact pattern as to a different company that had a different— Well, what if it was a more or less similar fact pattern? It's just somebody else comes forward with another way of making this system more beneficial for the consumers, for the people lending their stock. Every company that's allegedly boycotted will— the statute of limitations as to it, if there's an alleged conspiracy, would be evaluated on a case-by-case basis as to it. So there's certainly no suggestion here that because SLX shut down, that somehow borrowed another company that's allegedly boycotted—  If there was a decision, which is what is being alleged, to freeze out competitors, that decision happened with respect to the client, to SLX. So if they have made that decision, and it has been made, are you saying that now further or additional folks can't claim an injury because that decision was where the statute of limitations started? No, and an important piece to focus on is when the injury accumulates to the entity for which the claim accrues. So here, the entity that's suing is SLX. And so the injury to it, accrued at the time it was allegedly put out of business, when it closed up shop, that's very different from a scenario in which other entities alleged to be injured. Okay, but you're saying now when it closed shop is the injury? Is that what you're saying, as opposed to when the supposed decision to boycott? So the final refusal to deal absolutely is the final point for purposes of the statute of limitations. But it's very clear in this case that all of the injury had accrued at the time when it decided to shut down its business. And that all occurred for more than four years before the claims here were brought. And so it's very clear from this fact pattern that there isn't any new point accumulating injury at the point where it decided it wasn't even going to continue to do business. Okay, what if we disagree and we decide that the 2015 patent sale is the new and independent act? What happens? Do you still prevail? So if the 2015 patent sale is the new independent act, it needs to also create new and accumulating injury. And with all due respect, what that would mean is create, as Judge Jacobs had asked, a scenario in which if they had waited two years to sell their patents, that would somehow extend the statute of limitations for two years. Had they never sold their patents, I'm not sure what that means. It might be what it means, but it would extend their statute of limitations. Okay, so I'm sorry. So now you're saying there's no scenario in which we can say that the injury was the 2015 sale? I mean, is that your position? Yes, the 2015 sale was the consequence of the alleged conspiracy. It wasn't the cause of it. Even if he proves, even if your competitor proves, your opponent proves, that it was purchased in order to shut them out of business? So, respectfully, the company had already been out of business, and therefore all of the injury had already been proved to at this point. Even if it's true that the patents had been purchased for purposes of shelving them as they allege, that still doesn't create any new unaccumulating injury to SLS. All of its injury had already been proved. Judge Sullivan actually made a very interesting point on this one, which is that there actually could be additional injury as a result of shelving those patents to the market, to competitors, if the idea was that another company couldn't buy its patents because defendants had them. But if that's true, any accumulating injury would have been to the market participants, those plaintiffs, for example, in the class action, not to SLS, because SLS's claims had proved at the time there was a refusal to deal, and at the time they had then shut its doors. I want to briefly mention in my remaining time the fraudulent concealment argument here, because it's very important. Fraudulent concealment requires a particularity that a plaintiff proved that the defendant had concealed from him the existence of their cause of action, that he remained in ignorance of that cause of action until some point within four years of the commencement of the action, and that the continuing ignorance was not attributable to a lack of diligence on his part. Now, here, plaintiffs allege that they didn't become aware of the alleged conspiracy until another class action lawsuit was filed in 2017. And in fact, they didn't file this lawsuit until November of 2018, after Judge Baila, in that case, had denied the defendant's motive to dismiss. But while there's very similar allegations underlying the alleged conspiracy, the plaintiffs in the two cases are very different. SLS was in the room where these meetings happened. The alleged statements were made directly to their representatives. They were there. So plaintiffs allege, for example, that in February 2013, there was a meeting in which they were told that Echolens was allegedly the mafia run by five crime families. According to the complaints in July 2013, they alleged that the warnings grew more serious in another meeting with that same executive, who warned that it would only join if the big boys committed to SLS. And I could go on and on. These are the allegations underlying the complaint. These are statements that were made directly to SLS. They were there. So their assertion that they couldn't have discovered through the exercise of reasonable due diligence, facts composing its claims, just falls flat. Go ahead, please. Accepting as true the allegations of the complaint, one can conclude that as a result of your client's successful violation of the antitrust laws, no one in the future is going to be investing any capital to compete with you. And therefore, as a result of this ruling on the statute of limitations, you have permanently banked the right to continue to violate the antitrust laws. Correct? No, I don't see it that way, Your Honor. Well, that's for sure, but I mean, why not? The distinction here, as we discussed earlier, is that cost of action accrues to every entity at the time their injury occurs. But who would invest the time and the energy to come up with a competitive system, one that would displace or be more efficient for the lenders of stock than your conspiracy? Then no one's ever going to challenge it, and you have a permanent antitrust violation. And those, Your Honor, are precisely the allegations that are made in the class action, which allege that the injury to market participants in the stock lending business accrues to each person who participates in a transaction for stock loans. And that case continues to proceed. That case is before Judge Phelan. The motion to desist was denied in that case. But here we're talking about an alleged refusal to deal for a particular entity, SLS. And as to them, the damages accrue at the time there was a refusal to deal and at the time they went out of business. Just very briefly, I know I have just a few moments left, and actually I think I'm a little bit over time, I want to just briefly mention that here it was not an abuse of discretion to deny or to amend. This is a substantive defect in plaintiff's theory. There's no allegations that can cure discretion and limitations issues here. Even in the library, there's a series of bullet points that are listed of what plaintiffs would conceivably add to a proposed amended complaint. Most of those relate to the 2015 asset sale. The only difference there is a vague allegation that they continued to try to do business after they shuttered their shop in 2014. But, of course, reaffirmations of prior refusals to deal don't restart the statute of limitations period. So it absolutely was within Judge Sullivan's discretion to deny or to amend. Thank you. All right. Thank you again, Your Honor. I'm going to do three things in this rebuttal, as quickly as I can. First, I'm going to talk about how there was a new distinct injury from the May 2015 sale. Then I'm going to talk about the fact that SLX was not out of business in May 2015. And the third, I'm going to talk about the fraudulent concealing. So let's talk about the injury first. The fact is, Judge Sullivan said this is just the continuation of the original refusals deal. But the injury that arises from a refusals deal means that a company like SLX doesn't get revenue. They say, JP Morgan, when we do business, we'd love to sell you our product. JP Morgan says, no, we don't want to buy that today. So they don't get revenue from that sale on a particular day. And that impairs the value of the company that seeks to compete. And when that company sells out, doesn't the impaired value get reflected in the price paid? So, Your Honor, no. That's your argument. That's exactly what Judge Sullivan said, Your Honor. That is what he assumed. But he didn't cite any cases. And it's wrong. Here's what happens. When you buy a company, you are trying to figure out what its future revenue is going to be. If you had a horseshoe company and you had great revenue for a bunch of years, but then the automobile comes out, guess what? The future value of your company is not based on those prior sales. On the flip side, we see every single day with technology companies. They have no revenue whatsoever. For years and years and years. And as investors, venture capitalists, and eventually even people who buy on the public market say, you know what? Amazon might have been running losses for 20 years, but what we see is the future where they're going to make a ton of money. So the value of a company when you buy its IP, when you buy its assets, is the future revenue that comes from that investors expect to get. So Judge Sullivan, really, with no citation, kind of made that same common sense inference, which is, you know what? Maybe the value on that day of anybody who ever paid by it is based on the past revenue that they have. And that is not a fair inference on a motion to dismiss or really at any point. And nobody is going to tell you when you have experts testifying in court one day that the value of your company is based on the fact that there were some abuses in the field three years ago. Everyone is going to say, what happens now? Now, when the banks, you know, stop their anti-trust conspiracy in a brand new market effort and say, let's streamline the stock lending business. How much revenue are they going to get now? That's the value of their business. And so the damages that we suffered in May of 2015 was SLX lost the amount of money that was between 500,000 pounds, which is what the defendants managed to pay through their anti-trust conspiracy mapping issues, and the true value of SLX's product if they were not an anti-trust conspiracy, if they were able to enter that market. So that is a new and totally distinct injury. Up until that point, every single one of the injuries was what you described before, which is you lost two sales here and there. That counts. Those add up. That's significant. But then a much more significant injury is the value of your IT going forward in a world where there's not an anti-trust conspiracy. So that's our first one. The injury from the sale did occur in May of 2015. So it's clearly over and out. And they have to say this because if they really have deepened their reach the way that I just did with you, there would be no question that that's what the injury was. So they came up with a new theory. They're like, SLX was actually out of business in September of 2014 because they made an application to one SLX subsidiary, made an application to one European regulator to cancel one particular license. That is not the amount of business. In May of 2015, SLX entered into a contract. They entered into a purchase agreement with the defendants. You can't do that if you're out of business. SLX didn't go into dissolution proceedings, none of the subsidiaries, until as early as October of 2015. So the only case they cite is the one case that might come out as a stock child case or something like that. The one case they cite where a company was out of business and, therefore, the court in that case said there was a final interoperable dues deal at the time that the company was out of business, was a company that was collecting fine art-type things that went into dissolution four years before the case was signed. So if you could wind up your argument. Okay, sorry. I never really got to the heart of the concealment. But they made many, many, many statements that essentially said that they were going to do business with us. And they speak out of both sides of their mouth when they say, guess what? It was clear that that Moffatt comment was definitely an issue of the juvenile notice. This is what they said, what the defendants said, for a judge bailing. Well, we already know who the black bailiffs are. I know there are six defendants, maybe there are five of us. There's different entities. But it's not plausible at all that you can say that there was an antitrust conspiracy. And Judge Taylor agreed with that. She said, listen, I'm not even counting that statement about the Mafia. We're not considering the direct evidence. Because that guy who spoke it could easily have just had a sense of humor or been speaking in exaggerated terms. We had over 30 meetings. We were diligent. We didn't know. I know I'm out of my time. Thank you so much for your research. Thank you. Thank you. We'll take it under adjustment.